LONE STAR AIR PARTNERS, LLC, Plaintiff–Appellant,

v.

DELTA AIR LINES, INC., and the Post–Effective Date Committee of Delta Air Lines, Inc., Defendants–Appellees.

No. 07 Civ. 11143(SAS).

United States District Court, S.D. New York.

May 8, 2008.

Richard G. Smolev, Esq., Piper A. Brock, Esq., Kaye Scholer LLP, New York, NY, for Plaintiff–Appellant.

Michael E. Wiles, Esq., Richard F. Hahn, Esq., Debevoise & Plimpton LLP, New York, NY, Daniel H. Golden, Esq., David H. Botter, Esq., Mitchell P. Hurley, Esq., Akin Gump Strauss Hauer & Feld LLP, New York, NY, for Defendants–Appellees.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

This bankruptcy appeal arises out of a claim objection stemming from leveraged lease transactions involving aircraft. Lone Star Air Partners LLC ("Lone Star") has filed claims pursuant to tax indemnification agreements (the "TIAs") entered into with debtor Delta Air Lines, Inc. ("Delta") to recover for adverse tax consequences resulting from a sale of Lone Star's interests in the trust estates that own the aircraft. Delta objects to the claims on the ground that the TIAs excuse Delta from indemnification and seeks affirmation of the Bankruptcy Court's order disallowing Lone Star's TIA claims.

In its decision and order, the Bankruptcy Court found that there had been no

exercise of a remedy under the relevant leases (the "Leases") and that Lone Star's sale of its interest in the aircraft was purely voluntary and was not attributable to Delta's default or to any other remedial action.[1] As a result, the Bankruptcy Court disallowed Lone Star's claims.

The issues raised on appeal are (1) whether the Bankruptcy Court erred in holding that there was no "exercise of a remedy" pursuant to Section 15 of the Leases; (2) whether the Bankruptcy Court erred in holding that Lone Star's sale of its beneficial interest in the trust estate was not "attributable to" the exercise of a remedy under Section 15 of the Lease; and (3) whether the Bankruptcy Court erred as a matter of law in holding that the language of the TIAs was not ambiguous.[2] For the following reasons, the Bankruptcy Court's order disallowing Lone Star's claims is reversed and the Bankruptcy Court is directed to reinstate those claims.

## II. BACKGROUND

A brief review of the relevant facts and procedural history is set forth below. A full recitation of the facts can be found in the Bankruptcy Court's October 5, 2007 Opinion and Order.[3]

### A. Leveraged Leasing Transactions Generally[4]

A leveraged lease is a structure largely motivated by tax considerations. As a matter of federal income taxation law, the owner of an aircraft is generally entitled to depreciate the cost of that aircraft over seven years.[5] This depreciation offsets taxable income and thus decreases the owner's overall tax liability. Because depreciation takes the form of a deduction, it is generally valuable only to a taxpayer who has taxable income. Broadly, a corporation that has sustained a loss for a given year and thus does not anticipate paying income tax would not benefit from a depreciation deduction in that year.

Because the air transport industry is cyclical, many airlines do not generate consistent income. Thus, airlines that own their aircraft may not always take full advantage of the tax benefits associated with those aircraft. To avoid this result, many aircraft are owned by profitable corporations not involved in the air transport industry and are leased to airlines.

In a typical aircraft leveraged lease, the aircraft is owned by a trust (the "owner trust") established for the benefit of a profitable corporation.[6] The corporation contributes a small portion of the capital required to purchase the aircraft.[7] The

1. *See In re Delta Air Lines, Inc.*, No. 05–17923, 2007 WL 2932774, at *7 (Bankr. S.D.N.Y. Oct.5, 2007).

2. *See* Appellant's Opening Brief on Appeal ("Appellant Mem.") at 2.

3. *See In re Delta Air Lines*, 2007 WL 2932774, at * 1–4.

4. *See generally Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 140 (2d Cir.1998). The discussion of leveraged leasing provided here is only a broad overview. For a more complete discussion, see John Andre LeDuc, *Fundamental Federal Income Tax Considerations in Current United States Leasing Transactions*, 413 PLI/Tax L. & Est. Planning 305 (1997).

5. *See* I.R.C. § 168(c), (e)(1). The typical useful life of an aircraft significantly exceeds seven years.

6. The owner trust is generally a "grantor trust" under federal income tax law. The income from assets owned by a grantor trust is taxed to the grantor (the creator of the trust), and the deductions associated with those assets are likewise available to the grantor. *See* I.R.C. § 671.

7. The Internal Revenue Service has stated that if the lessor does not have at least twenty percent of the purchase price of an asset at risk, the lessor might not be considered the

remainder of the purchase price is covered by a lender, which loans funds to the owner trust on a non-recourse basis. The lender takes a security interest in the aircraft, although the interest is generally held by an indenture trust for the benefit of the lender. The owner trust then leases the aircraft to the airline. In addition to the depreciation deductions associated with the aircraft, the beneficiary of the owner trust can generally deduct interest payments on the debt and can amortize expenses incurred in structuring the transaction over the term of the lease.

Under this arrangement, the airline typically makes lease payments directly to the indenture trust, which makes payments on the loan and remits the balance to the owner. Because the owner enjoys the tax benefits of ownership of the aircraft, it will accept a below-market lease payment. As a result, the airline indirectly benefits from the tax deductions.

## B.  Overview

In this transaction, several trusts (the "Trusts") purchased certain aircraft (the "Aircraft") and leased them to Delta.[8] Lone Star advanced approximately twenty-five percent of the funds needed to purchase the Aircraft to the Trusts and the remaining seventy-five percent was financed pursuant to Trust Indenture and Security Agreements (the "Trust Indentures").[9] The Trust Indentures granted the Indenture Trustee a security interest in the Trusts' ownership interest in the Aircraft and assigned to it the Trusts' rights under the Leases.[10]

This transaction resulted in a flow of tax deductions to Lone Star. However, Lone Star could be forced to recapture those deductions (if certain events occurred) and could incur an unexpected rise in taxable income resulting from the early termination of the transaction.[11] To protect against such risks, Lone Star and Delta entered into the TIAs, which provided that Delta would indemnify Lone Star if any act or omission of Delta or the Indenture Trustee caused Lone Star to lose the tax benefits of the arrangement.[12]

As a result of high fuel prices and soaring labor and retirement benefit expenses, Delta and a number of its affiliates filed for reorganization under Chapter 11 of the Bankruptcy Code on September 14, 2005.[13] As part of the reorganization, Delta and the Indenture Trustee agreed to a Modified Restructuring Term Sheet (the "Bingham Term Sheet") that addressed many of Delta's leased aircrafts, including the Lone Star planes.[14] The agreement was approved by the Bankruptcy Court on February 15, 2006.[15] The Bingham Term Sheet called for a restructuring of the Leases at issue.[16] However, the Leases could not be restructured without either Lone Star's consent or foreclosure of Lone

---

true owner of the asset for federal income tax purposes. *See* Rev. Proc.2001–28.

8.  *See In re Delta Air Lines*, 2007 WL 2932774, at *1. The TIAs covered leased aircraft with tail numbers N636DL, N637DL, and N638DL. *See* Appellant Mem. at 3.

9.  *See In re Delta Air Lines*, 2007 WL 2932774, at *1.

10.  *See id.*

11.  *See id.*

12.  *See id.*

13.  *See In re Delta Air Lines*, 2007 WL 2932774, at *1.

14.  *See* Appellant Mem. at 3.

15.  *See id.*

16.  *See id.* at 6.

Star's interests.[17] Lone Star did not consent to the restructuring.[18]

On March 19, 2006, the holders of the outstanding loans (the "Debtholders") asked if Lone Star was willing to purchase the outstanding debt or, alternatively, enter into consensual foreclosure agreements in which title to the Aircraft and the Trusts' interests in the Leases would be surrendered to the Indenture Trustee in exchange for a cancellation of the outstanding debt and residual money.[19] The Debtholders were unwilling to sell their debt at any discount to par and Lone Star was unwilling to purchase the debt without a discount.[20] Lone Star was also unwilling to enter into consensual foreclosure arrangements.[21]

With the understanding that the Debtholders would proceed to a public sale or auction of the Aircraft, Lone Star attempted to locate a purchaser for the Aircraft to ensure the highest possible sale price at the anticipated auction.[22] On May 26, 2006, the Indenture Trustee informed Lone Star that it had elected to foreclose upon Lone Star's interests in two of the Aircraft and auction them to the highest bidder on June 29, 2006.[23] An auction of the third Aircraft was expected to follow soon after.[24]

In response to the notice, Lone Star identified Vx Capital Partners, LLC ("Vx") as a prospective buyer on terms that would generate an acceptable recovery by Lone Star after the outstanding debt on the Aircraft had been repaid at par.[25] On May 30, 2006, Lone Star entered into an agreement with Vx to sell its interests in the three planes contingent upon the Debtholders' agreement to repayment of their debt at par.[26] The Debtholders were not willing to accept payment at par.[27] Lone Star and Vx agreed to postpone their transaction to seek an agreement on this issue, but no agreement was reached.[28] On July 17, 2006, the Indenture Trustee held a foreclosure auction with respect to two of the Aircraft.[29] The third was never auctioned, but the Debtholders announced their intention to proceed with an auction.[30]

Vx was the highest bidder, but the sale of the Aircraft was contingent on the successful negotiation and execution of sales documentation.[31] The Debtholders then threatened to forgo the sale to Vx unless Lone Star agreed to pay the premium they demanded.[32] Lone Star and Vx eventually reached another agreement in which Lone Star agreed to sell its interests in the Trusts to Vx, and that sale was completed on October 19, 2006.[33]

17. *See id.*

18. *See id.*

19. *See id.*

20. *See id.* at 7.

21. *See id.*

22. *See id.*

23. *See id.*

24. *See id.*

25. *See id.*

26. *See In re Delta Air Lines,* 2007 WL 2932774, at *3.

27. *See id.*

28. *See id.*

29. *See id.*

30. *See id.*

31. *See* Appellant Mem. at 8.

32. *See id.*

33. *See id.*

As a result, Lone Star incurred various tax losses in excess of $ 15,635,813.[34] Lone Star filed claims against Delta's estate for this amount, arguing that the TIAs mandate Delta to indemnify Lone Star's losses because they arose from a sale of its ownership interests that was "attributable to" the Indenture Trustee's exercise of remedies under Section 15 of the Leases.[35]

Delta filed an objection to Lone Star's claims, arguing that Lone Star was not entitled to indemnification under the TIAs.[36] On October 5, 2007, the Bankruptcy Court sustained Delta's objections to Lone Star's claims, holding that Lone Star had no right to indemnification under the TIAs because the sale to Vx was not "attributable to the exercise of a remedy" under the Leases.[37]

## III. APPLICABLE LAW

### A. Final Order

The district courts are vested with appellate jurisdiction over bankruptcy court rulings.[38] Final orders of the bankruptcy court may be appealed to the district court as of right.[39] An order is final if "[n]othing in the order ... indicates any anticipation that the decision will be reconsidered."[40] "'An order allowing or disallowing a claim is a final, appealable order.'"[41]

### B. Standard of Review

A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[42] Findings of fact are reviewed for clear error.[43] A finding of fact is clearly erroneous if the court is "'left with the definite and firm conviction that a mistake has been committed.'"[44] A bankruptcy court's conclusions of law, by contrast, are reviewed *de novo*.[45] Because the present dispute involves the interpretation of a contract, *de novo* review is required.[46] "Likewise, '[a] lower court's threshold determination as to whether a contract is ambiguous ... is

**34.** *See id.*

**35.** *See id.* at 9.

**36.** *See* Brief on Appeal of Appellees Delta Air Lines, Inc. and the Post–Effective Date Committee ("Appellees Mem.") at 2.

**37.** *See In re Delta Air Lines*, 2007 WL 2932774, at *7.

**38.** *See* 28 U.S.C. § 158(a).

**39.** *See id.* § 158(a)(1).

**40.** *In re Palm Coast, Matanza Shores Ltd. P'ship*, 101 F.3d 253, 256 (2d Cir.1996).

**41.** *EDP Med. Computer Sys. v. United States*, 480 F.3d 621, 626 (2d Cir.2007) (quoting *Orsini Santos v. Mender*, 349 B.R. 762, 768 (1st Cir. BAP 2006)).

**42.** *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir.1993) ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

**43.** *See* Fed. R. Bankr.P. 8013 ("Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *See also In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir.2003).

**44.** *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

**45.** *See In re Cody, Inc.*, 338 F.3d at 94; *In re 139–141 Owners Corp.*, 313 B.R. 364, 367 (S.D.N.Y.2004).

**46.** *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir.2007) ("Contract interpretation as a question of law is also reviewed *de novo* on appeal.").

subject to *de novo* review.' " [47]

## IV.  DISCUSSION

### A.  The TIAs

The TIAs require Delta to indemnify Lone Star if Lone Star loses tax benefits "as the result of ... any act or omission" by Delta as lessee.[48]  Section 7(a) excludes from that obligation losses that arise from

> any voluntary or involuntary sale or other disposition (other than a substitution or replacement) by [Lone Star] of the Aircraft ... unless a [default] shall have occurred and be continuing at the time of such sale or disposition and such sale or disposition is attributable to the exercise of a remedy available to [Lone Star] pursuant to Section 15 of the Lease in response to the occurrence of such [default] .... [49]

There is no dispute that Delta defaulted on its obligations as lessee or that Lone Star's sale of its interests in the Aircraft constitutes an excluded event under Section 7(a). Therefore, to obtain indemnification, Lone Star must show that the sale of the Aircraft was "attributable to the exercise of a remedy available to [Lone Star] pursuant to Section 15 of the Lease[s] ...." [50]  The

Trust Indentures granted to the Indenture Trustee all of Lone Star's rights and powers under the Leases.  Therefore, Lone Star must demonstrate that the sale of its interest in the Aircraft was attributable to the Indenture Trustee's exercise of a remedy pursuant to Section 15 of the Leases.

### B.  Exercise of a Remedy

■  Upon the occurrence of a default by Delta, Section 15(f) of the Leases permits Lone Star (and thus the Indenture Trustee) to "exercise any ... right or remedy [that] may be available under applicable law," including sale of the Aircraft.[51] Lone Star has acknowledged that the Indenture Trustee did not sell the Aircraft. However, Lone Star points to two acts that it asserts were exercises of remedies: (1) the Indenture Trustee's agreement to the Bingham Term Sheet, which called for the restructuring of the Leases, and (2) pursuant to the Bingham Term Sheet, the Indenture Trustee's notice to Lone Star of foreclosure, including publishing notice, registering bidders, and conducting an auction.[52]

The Bankruptcy Court found that entry into the Bingham Term Sheet does not constitute an "exercise of a remedy" pur-

---

**47.**  *Lee v. Bsb Greenwich Mortgage Ltd. P'ship,* 267 F.3d 172, 178 (2d Cir.2001) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999)).

**48.**  *See* TIA § 6, Ex. A to Appellant's Designation of Record.

**49.**  *See id.* § 7(a).

**50.**  Lone Star argues that Section 7(a) of the TIA is ambiguous and that the Bankruptcy Court should have considered extrinsic evidence to ascertain its meaning.  The Bankruptcy Court correctly held that Section 7(a) was not ambiguous and no extrinsic evidence was needed.

**51.**  *See* Lease § 15, Ex. H to Appellant's Designation of Record.

**52.**  Lone Star also argues that Delta should be estopped from arguing that there has been no exercise of a remedy because Delta had previously argued before the Bankruptcy Court that the Indenture Trustee's entry into the Bingham Term Sheet was an exercise of remedies under Section 15.  However, Lone Star has not been able to identify a decision of the Bankruptcy Court that adopted Delta's position.  As a result, Delta is not subject to judicial estoppel.  *See Stichting v. Schreiber,* 407 F.3d 34, 45 (2d Cir.2005) (limiting estoppel to "situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced").

suant to Section 15 of the Leases. It concluded that the Indenture Trustee's authority to enter into the Bingham Term Sheet came not from Section 15(f) of the Leases, but rather from "the inherent power of any party to contractual arrangements to renegotiate the terms of those arrangements."[53] It further determined that the Bingham Term Sheet contemplated at most "the *future* exercise of a remedy under the Leases when there would be a *future* foreclosure on the [Aircraft]."[54]

I disagree with this conclusion. Regardless of the source of the Indenture Trustee's authority to enter into the Bingham Term Sheet, that action qualifies as an exercise of a remedy under Section 15(f) of the Leases. That section explicitly encompasses "any ... right or remedy [that] may be available under applicable law ...."[55] This language means what it says—that any steps authorized by law and taken by Lone Star (and, by extension, the Indenture Trustee) to remedy a default constitute the exercise of a remedy under Section 15(f). The renegotiation of the Leases following Delta's default falls within the broad purview of this language.

I also disagree with the Bankruptcy Court's holding that the Indenture Trustee's actions—giving notice and holding an auction—did not constitute an exercise of a remedy. Section 15(b) of the Leases provides that the lessor can elect "with or without taking possession thereof, [to] sell or otherwise dispose of the Aircraft ... at public or private sale."[56] The actions taken by the Indenture Trustee—notice and holding an auction—are part of the activity of selling the Aircraft. Section 15(b) of the Lease is the only provision that authorizes such activities. Therefore, although the auction did not result in a consummated sale, the Indenture Trustee took steps to bring about a sale of the Aircraft. Section 15 does not authorize or distinguish among incremental movements toward a remedy—on the contrary, any action taken pursuant to Section 15 is the exercise of a remedy.[57] To hold otherwise would impose an unduly formalistic approach that is not supported by the plain language of that section. The Indenture Trustee therefore exercised remedies under the Leases.[58]

This conclusion is also supported by a prior decision of the Bankruptcy Court in connection with this bankruptcy. Reviewing a claim for benefits under similar tax

---

53. *In re Delta Air Lines*, 2007 WL 2932774, at *5.

54. *Id.*

55. Lease § 15(f).

56. Lease § 15(b).

57. The Bankruptcy Court observed that if steps taken in furtherance of the sale of the Aircraft constituted an exercise of a remedy, then "there would be no objective limiting principle guiding when an 'attempted' exercise of a remedy has occurred." *In re Delta Air Lines*, 2007 WL 2932774, at *6. But the objective limiting principle is simply that remedies are steps that are authorized by Section 15. When the Indenture Trustee takes such steps, including the entry into the Bingham Term Sheet, it has exercised a remedy. By contrast, "informal discussions between the Indenture Trustee and potential buyers," *see id.*, are not the exercise of a remedy because they are not within the scope of Section 15.

58. I am not upsetting the Bankruptcy Court's factual conclusions regarding the actions taken by the parties. However, I disagree with the Bankruptcy Court's interpretation of the Leases. The Bankruptcy Court described Lone Star's argument that adoption of the Bingham Term Sheet was an exercise of a remedy as "factually wrong," *id.* at *5, but whether a given set of actions is an exercise of a remedy is a question of contract interpretation. In this case, *de novo* review is appropriate because the contract is unambiguous. *See Phillips,* 494 F.3d at 384.

indemnity agreements not at issue here, the court observed that there was no dispute that the indenture trustee (as assignee for the lessor) "invoked its right under Section 15(e)" by simply demanding payment for the breach of the Leases.[59] Just as the parties in that context did not dispute that the demand for payment alone, without the receipt of actual payment, was an act authorized under Section 15, similarly here the Indenture Trustee's steps toward sale of the Aircraft (even without the consummation of the sale) constitute the exercise of a remedy as permitted by Section 15.

### C. "Attributable to" the Exercise of a Remedy

■ Because I have found there to be an exercise of a remedy, I now turn to whether Lone Star's sale of its interest was "attributable to" that exercise of a remedy. The Bankruptcy Court reached this issue even though it did not find an exercise of a remedy and held that Lone Star's sale of its interests in the Trusts was not "attributable to" any attempted, threatened, aborted, or other exercise of a remedy. In so holding, the Bankruptcy Court adopted Delta's argument that Lone Star's decision to sell its interest was a "voluntary decision" and that "Lone Star, not Delta, should bear the economic consequences resulting from its decision."[60]

Again, I respectfully disagree. Once the Indenture Trustee exercised a remedy under the Leases, it was evident that Lone Star's beneficial interest in the Trusts would be extinguished, either through its consent to the restructuring or, absent consent, by foreclosure. Under either scenario, Lone Star would not only lose its interest in the Trusts and its future streams of rental income (minus debt service), but it would also suffer tax consequences. The purpose of the TIAs was to address just such a circumstance—to provide Lone Star with a remedy against Delta for its tax loss when Delta's acts or omissions resulted in a default that caused the loss.[61]

Lone Star's actions were clearly in response to the Indenture Trustee's exercise of a remedy. Lone Star only negotiated the eventual sale to Vx after learning that the Indenture Trustee and Delta had executed the Bingham Term Sheet and that the Indenture Trustee was required to foreclose. In response, Lone Star sought buyers willing to participate in the auction. Lone Star realized that the Bingham Term Sheet required the Indenture Trustee to foreclose on the Aircraft, but with Delta's cooperation, the Indenture Trustee could delay foreclosure.[62] A delay would cause the interest on the debt to accumulate and diminish the value of Lone Star's interest, thus creating pressure for it to pay the

---

59. *In re Delta Air Lines, Inc.*, 370 B.R. 552, 558 (Bankr.S.D.N.Y.2007). *See also In re Delta Air Lines, Inc.*, 381 B.R. 57, 71 (Bankr.S.D.N.Y.2008) ("Upon ... events of default, the indenture trustee had the sole right to control the exercise of remedies under the Lease, including *the right to demand payment* of outstanding rent plus [stipulated loss value], and the right to foreclose on the Aircraft.") (emphasis added).

60. *In re Delta Air Lines*, 2007 WL 2932774, at *7.

61. Thus, while I do not question the Bankruptcy Court's factual finding that the sale of the Aircraft was "voluntary" in the sense that Lone Star chose to sell the Aircraft rather than face a greater financial loss through foreclosure, the fact that the sale was voluntary does not preclude its attribution to the Indenture Trustee's exercise of a remedy.

62. *See* Appellant Mem. at 17.

Debtholders a premium upon foreclosure.[63] Lone Star then chose the option that best preserved the value of its assets. Lone Star's decision to sell its interest was "attributable to" the choice of either consenting to restructuring or foreclosure pursuant to the terms of the Bingham Term Sheet.

Delta argues that the sale is not attributable to the exercise of a remedy unless "the sale is thrust upon [Lone Star] as a result of an exercise of remedies under the Leases ...." [64] But this is exactly what occurred. There is no evidence in the record that Lone Star sought to sell its interest in the Aircraft prior to its receipt of notification of foreclosure. On the contrary, Lone Star's sale was the natural product of the renegotiation of the Leases. It was therefore "attributable to" an exercise of a remedy.

## V. CONCLUSION

For the reasons discussed above, the Bankruptcy Court's order is reversed and the Bankruptcy Court is directed to reinstate Lone Star's claim. The Clerk of the Court is directed to close this appeal.

SO ORDERED:

**63.** *See id.*

**64.** Appellee Mem. at 13.